NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 75

No. 2019-388

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Orleans Unit, |
| | Criminal Division |
| | |
| Phillip Walker-Brazie & Brandi-Lena Butterfield | December Term, 2020 |

Scot L. Kline, J.

David Tartter, Deputy State's Attorney, and Spencer Davenport, Law Clerk (On the Brief), Montpelier, for Plaintiff-Appellee.

James Diaz and Lia Ernst, ACLU Foundation of Vermont, Montpelier, for Defendants-Appellants.

Matthew Valerio, Defender General, and Dawn Seibert, Appellate Defender, Montpelier, for Amici Curiae Office of the Defender General and Vermont Association of Criminal Defense Lawyers.

Benjamin D. Battles, Solicitor General, Montpelier, for Amicus Curiae Attorney General Thomas J. Donovan, Jr.

Jared Kingsbury Carter, Assistant Professor of Law and Co-Director, Appellate Advocacy Project, Vermont Law School, South Royalton, for Amicus Curiae Migrant Justice.

PRESENT:  Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1.    **COHEN, J.**  In this interlocutory appeal, we must decide whether evidence seized by federal Border Patrol agents during a roving patrol—pursuant to their authority to conduct warrantless searches under 8 U.S.C. § 1357—is admissible in a state criminal proceeding when that

search does not comply with Article 11 of the Vermont Constitution.[1] Defendants Phillip Walker-Brazie and Brandi-Lena Butterfield argue that because the overwhelming purpose of Vermont's exclusionary rule is to protect individual liberty, we should apply the exclusionary rule and suppress the evidence pursuant to Article 11. We agree, and hold that such evidence is inadmissible in Vermont criminal proceedings.

## I. Facts

¶ 2.     The court made the following findings of fact for the purpose of defendants' motion to suppress. In August 2018, United States Border Patrol agent Jeffery Vining was on roving patrol in a marked vehicle about one mile from the Canadian border. He was parked in a "semi-concealed location" at the intersection of Vermont Route 105 and North Jay Road, which he testified is a remote area historically used to smuggle people and narcotics across the border. At around 9:45 p.m., he observed a vehicle driving west on Route 105 at an estimated fifty-five miles an hour. The vehicle slowed down as if it were going to turn onto North Jay Road. Upon seeing Agent Vining's vehicle, the vehicle appeared to change course, and drove straight through the intersection.

¶ 3.     Agent Vining thought this behavior was suspicious and followed the vehicle. The vehicle stayed well below the speed limit. Agent Vining thought the driver looked nervous because she kept checking her mirrors. He looked up the vehicle's registration and learned that the vehicle's owner, Butterfield, had previous "encounters involving narcotics." Based on this information, he pulled the vehicle over.

¶ 4.     Agent Vining approached the vehicle, identified himself as a Border Patrol agent, and asked the occupants about their citizenship. Butterfield was in the driver's seat and Walker-

---

[1]  For the purpose of this appeal, we assume that the Border Patrol agents complied with federal law. See infra, ¶ 10. To the extent defendants contest the court's findings that the agent had reasonable suspicion for the stop and probable cause for the search, they are not within the question certified to this Court.

Brazie, whom Agent Vining recognized from previous law enforcement encounters, was in the passenger seat. Agent Vining smelled a strong odor of "green or unburnt marijuana," saw numerous bags in the vehicle—which in his experience were "sometimes used to carry illegal items" across the border—and thought that the occupants appeared nervous. Although defendants refused to give Agent Vining consent to search their vehicle, the car was subsequently searched by additional Border Patrol agents who arrived after the stop. During the search, marijuana and a bag of hallucinogenic mushrooms were seized.

¶ 5. Border Patrol notified Vermont law enforcement and provided them with the seized evidence upon their arrival. Based on the evidence, the Orleans County State's Attorney charged Walker-Brazie with one count of unlawfully possessing two ounces or more of marijuana, in violation of 18 V.S.A. § 4230(a)(2), and one count of possessing ten or more doses of a hallucinogenic drug, in violation of 18 V.S.A. § 4235(b)(2). Butterfield was charged with one count of possessing marijuana, in violation of 18 V.S.A. § 4230(a)(1).

¶ 6. Defendants filed motions to suppress the evidence the Border Patrol agents seized during the August 2018 search. They argued that Agent Vining lacked reasonable suspicion because, among other things, their vehicle did not cross the border and Agent Vining knew, based on Butterfield's registration, that Butterfield lived in Vermont. Alternatively, defendants argued the search violated Article 11 of the Vermont Constitution because the agents did not have a warrant and there were no exigent circumstances. See State v. Bauder, 2007 VT 16, ¶ 21, 181 Vt. 392, 924 A.2d 38 (explaining that under Article 11, warrantless search of automobile is per se unreasonable absent showing of exigent circumstances in form of threat either to officer safety or to preservation of evidence).

¶ 7. In opposition, the State's Attorney argued that Agent Vining had reasonable suspicion to believe the vehicle was engaged in illegal activity because defendants were driving

3

suspiciously in an area close to the border that is known for smuggling people and illegal drugs.[2] In addition, the State's Attorney argued that the subsequent search was legal because according to State v. Rennis, 2014 VT 8, 195 Vt. 492, 90 A.3d 906, and State v. Coburn, 165 Vt. 318, 683 A.2d 1343 (1996), Article 11 does not apply to federal officials exercising exclusive federal authority to safeguard the border.

¶ 8.     Following a hearing, the trial court denied the motion to suppress.  The court concluded that based on United States Supreme Court precedent, Border Patrol agents on roving patrol must have reasonable suspicion of illegal activity to stop a vehicle.  Although the court acknowledged it was a "close call," it concluded that Agent Vining had reasonable suspicion because, among other things, he observed unusual driving in a remote area very close to the border that has historically been used for smuggling.  As to the search, the court concluded that the agents complied with federal law because they had probable cause for the search and therefore no warrant was required under the Fourth Amendment.  However, the court recognized that this conclusion did not resolve the issue of whether the Vermont Constitution applied to the use of the evidence in a Vermont criminal prosecution.

¶ 9.     Turning to that issue, and based on our decisions in Rennis and Coburn, the court reasoned that the Vermont Constitution does not apply to evidence seized by federal officials pursuant to their exclusive federal authority to safeguard the border and independent of state actors. The court acknowledged that Coburn and Rennis were factually distinguishable in that the searches in those cases occurred at an international airport and permanent checkpoint, respectively. However, it concluded that those decisions governed because the search in this case occurred "so close to the border" by agents exercising exclusive federal authority to safeguard the border that

---

[2] Because the State is represented in this appeal by two different authorities—the State's Attorney and the Attorney General—and because they argue divergent positions, we refer to the "State's Attorney" or "Attorney General" rather than "the State" throughout this opinion.

the federal interest in securing the border outweighed any state interest. The court determined that this conclusion was consistent with the "prevailing view" among states that when a search is validly conducted under federal law, "the law of the state of prosecution will not apply its exclusionary" rule to suppress the evidence. Finally, the court reasoned that Vermont's exclusionary rule should not apply because its primary purpose is to deter illegal police conduct and applying the rule to evidence lawfully seized under federal law would not deter any illegal conduct, especially when, as here, there is no evidence in the record of any collusion between federal and state authorities.

¶ 10. Defendants subsequently requested permission to file an interlocutory appeal of two questions: (1) whether Agent Vining had reasonable suspicion to stop their vehicle, and (2) whether the evidence gathered by federal agents during the warrantless search, which was illegal under Article 11, was admissible in a Vermont criminal prosecution. The court denied the motion on the reasonable-suspicion issue, explaining that because the issue relied on a "factual record for the appellate court to consider the circumstances surrounding and the reasons for the stop," the issue was not a pure question of law appropriate for interlocutory review. On the second issue, however, the court granted the motion and certified the question of "whether federal border patrol agents effecting a search of a vehicle very near but not at the border or formal checkpoint must follow Vermont law and obtain a search warrant before conducting a search of a motor vehicle."

¶ 11. On appeal, defendants argue that the trial court improperly relied on Coburn and Rennis because those cases are expressly limited to searches conducted at the border and its functional equivalent. Defendants submit that the Court should reject the so-called reverse-silver-platter doctrine and hold that evidence seized in Vermont by federal officials is subject to Article 11 because Vermonters' expectation of privacy is the same regardless of who conducts the search.[3]

---

[3] The "reverse-silver-platter doctrine" refers to decisions permitting the admission in state prosecutions of evidence obtained by federal authorities in a manner that complies with the Fourth Amendment but not the relevant state constitution. See Commonwealth v. Britton, 229 A.3d 590, 603 (Pa. 2020) (Wecht, J., concurring). The term originates from a line of U.S. Supreme Court

Furthermore, based on Vermont's exclusionary rule, defendants argue that any evidence seized by federal officials in violation of Article 11 should be suppressed because the purpose of Vermont's exclusionary rule is to protect individual liberty.

¶ 12. The State's Attorney argues that this case is squarely controlled by Coburn and Rennis, which both hold that the Vermont Constitution is not implicated when federal officials act pursuant to their exclusive authority to safeguard the border. Federal exclusive authority to safeguard the border, the State's Attorney submits, includes roving patrols conducted by Border Patrol agents "in the shadow of the border." It suggests, however, that Article 11 would apply to searches conducted in Vermont outside the "shadow" of the border.

¶ 13. The Defender General, Migrant Justice—a nonprofit focused on the rights of migrant farmworkers in Vermont—and the Attorney General filed amicus briefs on behalf of defendants. Like defendants, the Defender General argues that Coburn and Rennis only address whether the Vermont Constitution applies to searches conducted at the border and its functional equivalent. The Defender General asserts that applying Coburn and Rennis to searches conducted in the interior of the state would conflict with a long line of Article 11 cases, which "hold unequivocally that evidence obtained during search and seizures conducted within the interior of the state in violation of the Vermont Constitution may not be admitted in state criminal—or even civil—proceedings."

¶ 14. Meanwhile, Migrant Justice and the Attorney General expressly ask this Court to overrule Coburn and Rennis. Migrant Justice argues that Coburn's underlying rationale—that Vermont defers to federal law when the federal interest outweighs Vermont's interest—is no longer

cases holding that evidence obtained by state law enforcement officers in violation of the Fourth Amendment and handed over to federal law enforcement "on a silver platter" was admissible in federal criminal proceedings. Lustig v. United States, 338 U.S. 74, 78-79 (1949). The Court later rejected the federal silver-platter doctrine in Elkins v. United States, 364 U.S. 206, 215 (1960), holding that federal courts could not permit introduction of evidence obtained in violation of the Fourth Amendment, no matter the source.

practicable in light of the growth of Border Patrol activities in Vermont. Although the Attorney General concedes that the Vermont Constitution does not apply to federal officers, it submits that the admissibility of evidence in a criminal proceeding should be governed by the Vermont Constitution.

¶ 15. This appeal involves a pure question of law, which we review de novo. Bauder, 2007 VT 16, ¶ 9. We conclude that Coburn and Rennis do not govern the admissibility in state proceedings of evidence gathered during searches, like the one in this case, that take place outside the context of the border or its functional equivalent. Instead, we hold that searches conducted by federal border officials on roving patrol on interior Vermont roads are subject to Article 11's protections. Because the search in this case did not comply with Article 11, defendants' motion to suppress should have been granted.

## II. Merits

¶ 16. "The Vermont Constitution is the fundamental charter of our state, and it is this Court's duty to enforce the constitution." State v. Badger, 141 Vt. 430, 448, 450 A.2d 336, 347 (1982). Although the Vermont and federal constitutions share a similar history and purpose, our constitution is an independent authority and, in many cases, provides greater protection for individual rights than the federal constitution. Id. This is particularly so in the context of Article 11, the Vermont Constitution's search-and-seizure provision. See, e.g., State v. Geraw, 173 Vt. 350, 353 n.2, 357-58, 795 A.2d 1219, 1222 n.2, 1225 (2002) (holding police may not secretly record conversation in suspect's home without warrant); State v. Savva, 159 Vt. 75, 79, 87-88, 616 A.2d 774, 776, 780-81 (1991) (recognizing higher privacy expectation under Article 11 for closed containers in vehicle's interior); State v. Kirchoff, 156 Vt. 1, 10, 587 A.2d 988, 994 (1991) (holding Article 11 guarantees greater privacy rights in "open fields" than Fourth Amendment).

¶ 17. Article 11 provides:

> That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

Vt. Const. ch. I, art. 11. The core purpose of Article 11 is to protect legitimate expectations of privacy and dignity from unreasonable intrusions by the government. Savva, 159 Vt. at 87, 616 A.2d at 781 (explaining that "freedom from unreasonable government intrusions into legitimate expectations of privacy" is "a core value protected by Article 11 jurisprudence"); see also State v. Bryant, 2008 VT 39, ¶ 36, 183 Vt. 355, 950 A.2d 467 ("The overriding function of Article 11 is to protect personal privacy and dignity against unwarranted intrusion by the state.").

¶ 18. "Under the Vermont Constitution, unlike the federal constitution, protection against warrantless searches extends to automobiles." State v. Birchard, 2010 VT 57, ¶ 12, 188 Vt. 172, 5 A.3d 879. A warrantless search of an automobile is per se unreasonable under Article 11 unless there exists probable cause and a showing of exigent circumstances, meaning a threat to officer safety or to the preservation of evidence. State v. Bauder, 2007 VT 16, ¶¶ 22, 32, 181 Vt. 392, 924 A.2d 38. Absent the requisite showing, evidence gathered as a result of such a search is inadmissible in a state criminal proceeding. Badger, 141 Vt. at 452-53.

¶ 19. In this case, there is no dispute that if the search of defendants' vehicle had been conducted by Vermont law enforcement officials, the resulting evidence would have been excluded. The question before us is whether the fact that the search was conducted by Border Patrol agents on roving patrol requires a different result.

¶ 20. We have previously addressed the applicability of Article 11 to the actions of federal border officials in two cases. In State v. Coburn, United States Customs officers searched the defendant's suitcase, which was labeled with the defendant's name and a Randolph, Vermont, address, when he arrived at John F. Kennedy International Airport in New York on a direct flight

from Jamaica. Upon opening the suitcase, the officers noticed a strong odor of glue, removed the suitcase liner, and found several bags of marijuana. Federal authorities declined to prosecute and later transferred the suitcase to the Vermont State Police, who made a controlled delivery to defendant, then arrested and charged the defendant with possession of marijuana in violation of state law. The defendant filed a motion to suppress the evidence gathered by the Customs officers, which the trial court denied. Coburn, 165 Vt. at 320-21, 683 A.2d at 1344.

¶ 21. On appeal, the defendant argued that the search and seizure of his suitcase by federal and state authorities violated the Fourth Amendment and Article 11. Id. at 324-25, 683 A.2d at 1346-47. We explained that "[s]o long as the evidence seized in a permissible, routine customs border inspection meets federal standards for such searches . . . it is no violation of the defendant's federal constitutional rights if the evidence is later used in a state prosecution." Id. at 324, 683 A.2d at 1346 (quotation and alteration omitted). We concluded that admitting the evidence did not violate the defendant's federal constitutional rights because routine warrantless searches of persons and belongings entering the United States at a border crossing without reasonable suspicion or probable cause are "per se" reasonable under the Fourth Amendment. Id. at 321-22, 683 A.2d at 1345 (citing United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985)).

¶ 22. As to Article 11, we recognized as a general principle that "[w]e defer to federal law where the federal interest in the conduct at issue outweighs Vermont's interest." Id. at 325, 683 A.2d at 1347 (citing State v. St. Francis, 151 Vt. 384, 391, 563 A.2d 249, 253 (1989)). We held that "[w]ith respect to safeguarding the United States border or its functional equivalent . . . the federal interest is preeminent," because "[c]ontrol of commerce with foreign nations is an exclusive federal function under the United States Constitution . . . and '[t]he authority of the United States to search the baggage of arriving international travelers is based on its inherent sovereign authority to protect its territorial integrity.' " Id. (alteration in original) (citing U.S. Const. art. I, § 8, cl. 3, and quoting Torres v. Puerto Rico, 442 U.S. 465, 472-73 (1979)). Based on this reasoning, we

9

concluded that "the Vermont Constitution does not apply to the conduct of federal government officials acting under the exclusive authority to safeguard the borders of the United States." Id. at 325, 683 A.2d at 1347. Because Article 11 did not apply to lawful border searches by Customs officials, and the subsequent actions of the Vermont State Police did not violate Article 11, we affirmed the denial of the defendant's motion to suppress.

¶ 23. We subsequently applied the holding of Coburn in State v. Rennis. In Rennis, Border Patrol agents stopped the defendant at a permanent checkpoint near the intersection of interstates 91 and 89, approximately ninety-seven miles south of the Canadian border. 2014 VT 8, ¶ 2. At the checkpoint, the defendant's vehicle was searched, and a backpack was discovered containing "two freezer bags with a green leafy substance," which the defendant admitted was marijuana. Id. ¶ 5. The agents seized two pounds of marijuana and contacted Immigration and Customs Enforcement, which declined to prosecute. The agents then transferred the marijuana to state law enforcement. After the defendant was charged under Vermont law with possession of marijuana, he filed a motion to suppress the evidence under both the Fourth Amendment and Article 11, which the trial court denied.

¶ 24. On appeal, the defendant conceded that the search complied with the Fourth Amendment but argued that the evidence should be excluded under Article 11. We affirmed, explaining that the issue was "squarely controlled" by Coburn because that decision's "key holding" was that "the Vermont Constitution does not apply to the conduct of federal government officials acting under the exclusive federal authority to safeguard the borders of the United States." Id. ¶¶ 8-9. Although Coburn involved a search at an international airport—and the search in Rennis occurred at an immigration checkpoint ninety-seven miles from the border—we reasoned that Coburn still controlled because "the 'functional equivalent' of the U.S. border generally includes immigration checkpoints, such as those within the parameters listed in United States v. Martinez-

10

Fuerte, 428 U.S. 543 (1976)."[4] Id. ¶ 10. We noted that "[f]ederal courts have theoretically validated such checkpoints up to one hundred air miles from the physical border of the United States." Id. (citing Almeida-Sanchez v. United States, 413 U.S. 266, 268 (1973)). Because the constitutionality of the checkpoint was not at issue, we assumed that the checkpoint met the criteria for the functional equivalent of the border and concluded that Article 11 did not apply to the Border Patrol agents' conduct. Id.

¶ 25.    Defendants argue that Coburn and Rennis were expressly limited to searches at the border and its functional equivalent. They maintain that Coburn and Rennis should not be extended to searches in the interior because federal officials "lose their plenary border search" authority in the interior. Defendants and amici argue that roving patrols are sufficiently distinct from other Border Patrol activities in part because officers on roving patrol act more like general law enforcement officers enforcing state, as opposed to federal, law. Finally, defendants and amici argue that exempting Border Patrol agents on roving patrol from Article 11 will encourage state law enforcement to work with federal officers to bypass Article 11 protections. The State's Attorney, on the other hand, argues that this case is squarely controlled by Coburn and Rennis— federal officials were exercising exclusive federal authority to safeguard the border because they stopped a vehicle, close to the border, based upon reasonable suspicion that the occupants of the vehicle were involved with smuggling activity.

---

[4] In Martinez-Fuerte, the U.S. Supreme Court explained those parameters as follows:

> The Border Patrol believes that to assure effectiveness, a checkpoint must be (i) distant enough from the border to avoid interference with traffic in populated areas near the border, (ii) close to the confluence of two or more significant roads leading away from the border, (iii) situated in terrain that restricts vehicle passage around the checkpoint, (iv) on a stretch of highway compatible with safe operation, and (v) beyond the 25–mile zone in which "border passes" . . . are valid.

428 U.S. at 553.

11

¶ 26. We agree with defendants that Coburn and Rennis do not control here because the search in question did not take place at the border or its functional equivalent. Outside of those areas and within the interior of Vermont, the federal interest we identified in Coburn no longer outweighs the state interest in protecting the privacy and dignity of Vermont citizens. We therefore hold that where federal border officials on roving patrol obtain evidence in a manner that violates Article 11, that evidence may not be introduced at trial in a state criminal proceeding.[5]

¶ 27. Our conclusion is based on a line of U.S. Supreme Court decisions regarding the constitutionality of border searches, from which the concept of "the border or its functional equivalent" derives. In Almeida-Sanchez v. United States, the petitioner, a Mexican citizen holding a valid work permit, was stopped by Border Patrol agents on a road approximately twenty-five air miles north of the U.S.-Mexico border. 413 U.S. at 267-68. The Border Patrol agents searched his car without a warrant or probable cause and found a large quantity of marijuana. The petitioner was charged and convicted with transporting marijuana. He appealed, arguing that the search of his vehicle was unconstitutional and the evidence gathered during the search should not have been admitted as evidence against him.

¶ 28. The Court rejected the government's argument that the search was constitutional because the Border Patrol was authorized by 8 U.S.C. § 1357 to make warrantless searches within a "reasonable distance" from the border, which had been defined by regulation to be "within 100 air miles from any external boundary of the United States." Id. at 268, 272-73; see also id. at 275 (Powell, J., concurring). The Court recognized that the federal government had the power to exclude undocumented immigrants from the country, and that it was "without doubt that this power can be effectuated by routine inspections and searches of individuals or conveyances seeking to

_____

[5] Because we conclude that Coburn and Rennis are not controlling, we do not address the arguments by amici that those cases should be overruled.

12

cross our borders." Id. at 272 (majority opinion). Without opining on the permissible scope of such searches, the Court noted that they may take place at the border as well as its "functional equivalents." Id. It explained that searches at a permanent checkpoint at the confluence of two roads extending from the border could qualify as the functional equivalents of border searches. Id. at 273. Likewise, a search of passengers and cargo arriving by airplane on a nonstop flight from a different country "would clearly be the functional equivalent of a border search." Id.

¶ 29.    However, the Court concluded that "the search of the petitioner's automobile by a roving patrol, on a California road that lies at all points at least 20 miles north of the Mexican border, was of a wholly different sort." Id. at 273. In the absence of consent, such a search could only be conducted if there was probable cause, at least in the absence of a judicial warrant authorizing random searches by roving patrols in a particular area. Id.; see id. at 284-85 (Powell, J., concurring). The Court explained that such searches were not justified by the federal government's important interest in deterring illegal entry by citizens of other countries, stating that "[t]he needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power." Id. at 273 (majority opinion). In concluding, it quoted the following passage from Carroll v. United States, the Prohibition-era decision that established the so-called "automobile exception" to the Fourth Amendment's warrant requirement:

> It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor, and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

Id. at 274-75 (quoting 267 U.S. 132, 153-54 (1925)).

¶ 30.   Subsequently, in United States v. Brignoni-Ponce, the Court relied on Almeida-Sanchez to conclude that reasonable suspicion was required for Border Patrol officers on roving patrols to stop motor vehicles without a warrant.  422 U.S. 873, 884 (1975).  The Court rejected the government's claim that Border Patrol officers had unfettered discretion to stop vehicles near the border for questioning, noting that roads near the border carry a large volume of legitimate traffic.  Id.  "To approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers."  Id. at 882.

¶ 31.   In contrast, the following year, in United States v. Martinez-Fuente, the Court approved of routine vehicle stops conducted at permanent Border Patrol checkpoints.  428 U.S. 543, 557 (1976).  The Court explained that there was a substantial public interest in maintaining such checkpoints to deter smuggling of non-citizens, and that the intrusion on Fourth Amendment interests resulting from routine stops at these checkpoints was limited, unlike stops and searches by roving patrols.  Id. at 557-58.  It explained that "[r]oving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists."  Id. at 558 (quoting United States v. Ortiz, 422 U.S. 891, 894-95 (1975)).  In contrast, it reasoned that motorists were not taken by surprise by permanent checkpoints and that those checkpoints involved less discretionary enforcement activity and therefore left less room for abuse and harassment of individuals than roving-patrol stops.  Id. at 559.  Accordingly, the Court concluded that the Border Patrol could stop vehicles for brief questioning at permanent checkpoints without a warrant, though it reaffirmed that further detention or a search would require consent or probable cause.  Id. at 567.

¶ 32.   Since Almeida-Sanchez, the Court has not elaborated further on what constitutes the "functional equivalent" of the U.S. border.  But it is clear from that decision and its progeny that unlike the border itself, an international airport, or a permanent checkpoint, roving patrols near the

14

border are not the functional equivalent of the border for Fourth Amendment purposes. Removed from the context of the border itself, or a functional equivalent, the government's interest in deterring illegal immigration and trafficking, though still important, is counterbalanced by constitutional protections for individual rights. See Almeida-Sanchez, 413 U.S. at 273. Accordingly, the Court has determined that when conducting roving patrols, Border Patrol agents operate under the same federal constitutional constraints as any other law enforcement official when it comes to stopping and searching vehicles. Id.; see United States v. Singh, 415 F.3d 288, 294 (2d Cir. 2005) (explaining that "Border Patrol operations along inland routes—not at the border or its functional equivalent—including . . . roving patrols are held to a higher standard").

¶ 33. For similar reasons, we conclude that the federal interest in conducting searches of suspected smugglers during random stops by roving patrols on interior roads, unlike the routine border stops and inspections addressed in Rennis and Coburn, does not outweigh Vermont's strong interest in protecting the privacy and dignity of individuals traveling on the roads of this state. Although Border Patrol officers are acting pursuant to their authority to safeguard the border during these patrols, their authority to conduct stops and searches on inland roads—unlike at the border— is not limitless or exclusive. This context is therefore meaningfully distinct from the situations we faced in Rennis and Coburn, and we conclude that those decisions do not preclude defendants from invoking the protection of Article 11 here.

¶ 34. The State's Attorney argues that the search in this case took place only a mile or so from the Canadian border, in a wooded area where smuggling can occur, and therefore is essentially the same as a search by Customs officials at an international airport or by Border Patrol at a permanent checkpoint. However, the reasonableness of the search is not determined by the distance to the border, but the nature of the intrusion. As the U.S. Supreme Court explained in Martinez-Fuerte, individuals traveling across the international border expect to have their persons and luggage searched; such searches are routine and occur in a controlled and predictable context. 428

15

U.S. at 559. They involve less discretion by officials and therefore are less likely to result in abuse or harassment. Id. By contrast, roving patrols often occur late at night, on rural roads such as the one in this case, and may be frightening to drivers. Id. at 558. They also involve greater enforcement discretion, and therefore possibly greater abuse, by officials. Id. at 558-59; cf. State v. Sprague, 2003 VT 20, ¶ 19, 175 Vt. 123, 824 A.2d 539 (explaining that allowing law enforcement officers to order persons to exit vehicles without justification "invites arbitrary, if not discriminatory, enforcement"). The Court relied on these reasons in concluding that warrantless searches by roving patrols near the border were unreasonable absent probable cause. Martinez-Fuente, 428 U.S. at 558-59. For similar reasons, we conclude that the mere physical proximity to the border of the search in this case does not exempt it from the protections of Article 11.

¶ 35. The State's Attorney further argues that the Border Patrol agents' actions were lawful under federal law, and that in any event, the agents are not subject to Vermont law. Thus, the State's Attorney claims, even if Coburn and Rennis do not govern this case, exclusion of the evidence in a state criminal proceeding is an inappropriate remedy because it will have no deterrent effect on official misconduct and the public interest in admitting such evidence outweighs any private interest of defendants. In essence, the State's Attorney argues that we should recognize a broad exception to Article 11's warrant requirement for searches and seizures by federal officials who are acting pursuant to their lawful authority to safeguard the borders of the United States, regardless of the context or location in which those searches and seizures take place.[6]

¶ 36. We agree that our determination that Article 11 applies to the type of search in this case in no way interferes with federal officials' ability to exercise their authority to safeguard the borders. Our decision does not affect the authority of Border Patrol to conduct roving patrols, stop

---

[6] Although the State's Attorney suggests that patrols within "the shadow of the border" should be treated like border searches, we see no principled way to distinguish the effects of a roving patrol that takes place within a mile or two of the border from one that takes place ninety-nine miles away. Either way, the intrusion on defendants' privacy is the same.

16

and search vehicles suspected of violating federal immigration laws, or make arrests for those laws. We also agree that Article 11 does not absolutely prohibit warrantless searches and seizures. State v. Jewett, 148 Vt. 324, 328, 532 A.2d 958, 960 (1987). However, the circumstances under which exceptions are permitted "must be jealously and carefully drawn." Id. (quotation omitted).

¶ 37. Exclusion of the evidence gathered by federal officials in this case is consistent with the history and purposes of Vermont's exclusionary rule. As we have explained, evidence obtained in violation of the Vermont Constitution may not be admitted at trial in a state prosecution because such evidence "eviscerates our most sacred rights, impinges on individual privacy, perverts our judicial process, distorts any notion of fairness, and encourages official misconduct." Badger, 141 Vt. at 453, 450 A.2d at 349. While the U.S. Supreme Court has described the federal exclusionary rule "as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved," United States v. Leon, 468 U.S. 897, 906 (1984) (quotation omitted), we have not adopted this view. See State v. Oakes, 157 Vt. 171, 174, 598 A.2d 119, 121 (1991) (rejecting good-faith exception to exclusionary rule announced in Leon for searches made in good faith under warrant later found invalid). Deterrence of official violations is undoubtedly one purpose of Vermont's exclusionary rule, but it is not the sole or even primary purpose. See Badger, 141 Vt. at 453. Instead, we have emphasized that the focus in an exclusionary-rule analysis "should be on the individual constitutional rights at stake." State v. Lussier, 171 Vt. 19, 30, 757 A.2d 1017, 1025 (2000).

¶ 38. As discussed above, Article 11 guarantees individuals the right to privacy in their vehicles and to containers within those vehicles. Birchard, 2010 VT 57, ¶ 12. The search of defendants' car was an unreasonable intrusion into this privacy interest, and we have previously determined that the appropriate remedy for such a violation is exclusion of the evidence that was gathered. Id.; Savva, 159 Vt. at 87, 616 A.2d at 781. The intrusion into defendants' privacy was

not somehow lessened because the search was conducted by a federal agent. See Elkins v. United States, 364 U.S. 206, 215 (1960) ("To the victim it matters not whether his constitutional right has been invaded by a federal agent or by a state officer."); State v. Davis, 834 P.2d 1008, 1012 (Or. 1992) (explaining that because focus of Oregon's exclusionary rule is preservation of individual rights, "[i]n the context of a criminal prosecution, the focus then is on protecting the individual's rights vis-à-vis the government, not on deterring or punishing the excessive conduct of any particular governmental actor, local or otherwise"). The language of Article 11 is broadly worded—it protects individuals from unreasonable searches or seizures "by any officer or messenger." Vt. Const. ch. I, art. 11. In Vermont courts, defendants are generally entitled to the individual rights guaranteed by the Vermont Constitution, and "the public's interest in having strict police control over persons driving on our highways may not be satisfied at the expense of our constitutional right to be free from unbridled government interference in our lives." Lussier, 171 Vt. at 32, 757 A.2d at 1026.

¶ 39.    Applying the exclusionary rule here also protects the fairness and integrity of the judicial process. Vermont courts are bound to uphold the Vermont Constitution. See Vt. Const. ch. II, § 56 (requiring all judicial officers to swear or affirm that they will not "directly or indirectly, do any act or thing injurious to the Constitution" of Vermont). "Defense of that Constitution necessarily involves ensuring our criminal trials adhere to its mandates, and those mandates should not 'be impaired by judicial sanction of equivocal methods.' " Britton, 229 A.3d 590, 613-14 (quoting Byars v. United States, 273 U.S. 28, 33 (1927)). If we were to hold that evidence obtained in a manner that violates Article 11 is admissible in state criminal proceedings, we "would necessarily be placing [our] imprimatur of approval on evidence that would otherwise be deemed illegal, thus compromising the integrity of our courts." State v. Torres, 262 P.3d 1006, 1019 (Haw. 2011); see also Olmstead v. United States, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting) ("If

18

the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.").

¶ 40. Finally, although Border Patrol agents are bound only by the strictures of federal law, not Article 11, we disagree that our decision will have no deterrent effect whatsoever on official misconduct. We acknowledge that in this case, there is no evidence of collaboration between federal and state law enforcement officers to avoid the protections of Article 11. But a decision from this Court allowing the State to use evidence gathered in violation of the Vermont Constitution simply because it was gathered by federal law enforcement officers might implicitly encourage federal officers to engage in searches that Vermont officers cannot, so that Vermont officers will reciprocate by passing along information regarding immigration violations. Exclusion of the evidence is necessary "to promote institutional compliance with [Article 11] on the part of law enforcement agencies generally." Oakes, 157 Vt. at 180, 598 A.2d at 125.

¶ 41. Our holding is consistent with decisions by courts of other states that utilize a privacy rationale for their exclusionary rules. See Davis, 834 P.2d at 1012-13 (explaining that focus on individual protection under Oregon's exclusionary rule supports exclusion of evidence obtained in violation of Oregon Constitution, regardless of where obtained or by whom); Torres, 262 P.3d at 1020 (stating that because Hawaii's exclusionary rule protects privacy rights of defendant, those rights must "be given substantial weight when another jurisdiction's law is involved"); State v. Cardenas-Alvarez, 2001-NMSC-017, ¶ 18, 130 N.M. 386, 393, 25 P.3d 225, 232 (noting that purpose of New Mexico exclusionary rule is to protect individual right against unreasonable searches and seizures, and concluding that evidence obtained by federal officers in violation of that right must be excluded from state prosecutions). We are unpersuaded by the cases cited by the State's Attorney and the trial court to the contrary, because they focus primarily on a deterrence rationale rather than protecting individual privacy rights. See, e.g., Commonwealth v. Brown, 925 N.E.2d 845, 851 (Mass. 2010); State v. Boyd, 992 A.2d 1071, 1085 (Conn. 2010).

¶ 42.    We again emphasize that our determination that Article 11 applies to bar the use of the evidence gathered by the Border Patrol agents in this case does not constrain federal officials' ability to exercise their authority to safeguard the borders through the use of roving patrols.  It will not affect any prosecution against defendants in federal court.  The only effect of our decision is to prohibit state officials from using evidence found during such patrols in a manner that violates the state constitution against individuals in state criminal proceedings—a circumstance in which the federal government has no interest.

¶ 43.    The answer to the certified question is that evidence gathered in violation of Article 11 by Border Patrol agents on roving patrol is not admissible in a state criminal proceeding.

Reversed and remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____

Associate Justice

¶ 44.    **CARROLL, J., dissenting**.    The majority holds that evidence independently and lawfully obtained by federal Border Patrol agents exercising their exclusive authority to safeguard the U.S. border—and then lawfully turned over to Vermont law enforcement—must be excluded from Vermont criminal court proceedings because Vermont law enforcement officers presumably would have needed to obtain a warrant if they, rather than Border Patrol agents, had conducted the search of defendants' vehicle.  This holding is inconsistent with our controlling precedents, as well as the caselaw of most other jurisdictions, and does not further the purposes of our exclusionary rule.  Accordingly, I respectfully dissent.

¶ 45.    Before examining our relevant caselaw, I emphasize certain undisputed points of law and fact, which are discussed more fully below. The federal Border Patrol agents acted lawfully pursuant to federal search-and-seizure law in stopping and searching defendants' vehicle during a

20

roving patrol within approximately one mile of the U.S. border. For purposes of this appeal, we presume that reasonable suspicion supported the stop, and that probable cause supported the search.[7] Further, the stop and search of defendants' vehicle by the federal Border Patrol agents was conducted independently of Vermont law enforcement officers in furtherance of the agents' exclusive authority to safeguard the U.S. border. As established in our caselaw, the federal border agents' discovery of the evidence vitiated defendants' possessory interest in the evidence, such that the transfer of the evidence to Vermont law enforcement officials did not constitute a new search requiring probable cause or a warrant.

¶ 46. Looking more closely at our relevant caselaw, in State v. Dreibelbis, federal inspectors at the Derby Line border station discovered two pounds of hashish in the trunk of the defendant's vehicle during a routine border inspection. 147 Vt. 98, 511 A.2d 307 (1986). After federal Customs officials notified the Vermont State Police of the discovery, the state charged the defendant with a drug offense in Vermont criminal court. In an interlocutory appeal from the trial court's denial of his motion to suppress, the defendant argued, in relevant part, that because federal law did not require probable cause for routine border inspections, in contrast to non-border searches, the evidence discovered during the border search had to be excluded from the Vermont criminal court proceedings. Id. at 100, 511 A.2d at 308. We rejected this argument, concluding that "[s]o long as the evidence seized in a permissible, routine customs border inspection meets federal standards for such searches . . . it is no violation of the defendant's constitutional rights if the evidence is later used in a state prosecution." Id. (citation omitted).

---

[7] If this case were remanded, defendants could challenge the lawfulness of the stop under federal law in Vermont criminal court proceedings. Notably, the legal concepts of reasonable suspicion and probable cause are the same under federal and Vermont law. See State v. Brunella, 2020 VT 109, ¶ 6, ___ Vt. ___, 251 A.3d 550 (citing caselaw from both this Court and U.S. Supreme Court in defining reasonable suspicion); State v. Quigley, 2005 VT 128, ¶ 25, 179 Vt. 567, 892 A.2d 211 (Dooley, J., concurring) (quoting Maryland v. Pringle, 540 U.S. 366 (2003), for proposition that probable cause is generally defined as reasonable ground for particularized belief in guilt of person being searched or seized).

¶ 47. Ten years later, in State v. Coburn, we considered whether evidence of drugs discovered by Customs officials inspecting the belongings of passengers arriving on an international flight at John F. Kennedy International Airport in New York City was admissible in a Vermont criminal court proceeding initiated when federal authorities, who were not interested in prosecuting the defendant under federal law, turned the evidence over to Vermont law enforcement. 165 Vt. 318, 683 A.2d 1343 (1996). We rejected the defendant's arguments that: (1) the initial lawful search of his luggage at the airport became unlawful under federal constitutional law when the luggage was transferred to Vermont and examined by Vermont State Police; and (2) even if federal law was not violated, evidence recovered during the search was not admissible in the Vermont criminal court proceeding because the conduct of the Customs officials would not have passed muster under Article 11 of the Vermont Constitution. Id. Citing United States Supreme Court precedents, as well as Dreibelbis, we rejected the first argument, concluding that there was no "second search under the Fourth Amendment" because "the conduct of Vermont police [was] a continuation of the legal conduct of Customs officials" and that "the transfer of defendant's luggage from federal jurisdiction to state jurisdiction for purposes of state prosecution [did] not violate the Fourth Amendment." Id. at 323-24, 683 A.2d at 1346.

¶ 48. In rejecting the defendant's second argument, we reasoned that the federal interest in safeguarding the U.S. border or its functional equivalent was preeminent. Id. at 325, 683 A.2d at 1347. We held that "[b]ecause the Vermont Constitution does not apply to the otherwise lawful conduct of Customs officials, our scrutiny under Chapter I, Article 11 of the Vermont Constitution is limited to the conduct of the Vermont State Police." Id. We stated that defendant had failed "to articulate how his already vitiated possessory interest in his luggage was revived upon transfer from Customs to the Vermont police" and that because the Vermont police had acted lawfully "under the Fourth Amendment, using a plain-view rationale," that conduct was "similarly lawful under the Vermont Constitution using the same rationale." Id. at 326, 683 A.2d at 1347.

22

¶ 49. More recently, we reaffirmed our Coburn holding in a case involving drugs discovered at a fixed checkpoint maintained by the U.S. Border Patrol in Hartford, Vermont, ninety-seven miles south of the Canadian border. State v. Rennis, 2014 VT 8, 195 Vt. 492, 90 A.3d 906. We rejected the defendant's appeal of the denial of his Vermont criminal court motion to suppress the drugs discovered at the federal checkpoint and turned over to Vermont law enforcement. Id. ¶ 1. The defendant conceded the legality of the border agents' search under the Fourth Amendment but challenged the admissibility of the evidence under Article 11 in the Vermont criminal court proceeding. Assuming without deciding that the federal checkpoint met federal standards and thus was the functional equivalent of the U.S. border, id. ¶ 10, we cited Dreibelbis for the proposition that the defendant's Article 11 challenge applied only to the conduct of the state actors in the case. Id. ¶ 11. We noted that the defendant had failed to "allege that the Vermont State Police did anything other than receive the evidence uncovered in the federal search . . . and proceed to use the evidence in th[e] state prosecution." Id. ¶ 13. We stated that, like the defendant in Coburn, the defendant in Rennis failed to explain how his vitiated possessory interest was revived upon transfer of the evidence to the Vermont police. Id; see also 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 1.5(c), at 247-48 (6th ed. 2020) ("Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken." (citation omitted)).

¶ 50. Further, we explicitly rejected the defendant's reliance on State v. Cardenas-Alvarez—the only state case involving a search by border agents on which defendants rely in this case. 2001-NMSC-017, ¶ 1, 25 P.3d 225 (holding that "the New Mexico Constitution and laws apply to evidence seized by federal agents at a border patrol checkpoint sixty miles within the State of New Mexico when that evidence is proffered in state court").[8] We stated that our reasoning in

---

[8] The New Mexico Supreme Court later declined to extend its holding in Cardenas-Alvarez to an international border checkpoint. State v. Sanchez, 2015-NMSC-018, ¶ 28, 350 P.3d 1169.

Coburn precluded the defendant's argument, which relied on the rationale adopted in Cardenas-Alvarez, that evidence lawfully seized by federal Border Patrol agents pursuant to federal law in a manner that would have violated the Vermont Constitution must be suppressed in Vermont criminal proceedings. Rennis, 2014 VT 8, ¶¶ 14-15 ("Where we have determined that Article 11 does not apply, it also does not provide the remedy of the exclusionary rule."); see also State v. Bradley, 719 P.2d 546, 549 (Wash. Ct. App. 1986) (stating that because state law cannot control federal officers' conduct, several courts "have concluded that evidence lawfully obtained under federal standards by United States Customs officials is admissible in state court even if the search and seizure would have violated state law"). We acknowledged that if Vermont law enforcement officers had conducted the search, they would have had to comply with Article 11, but reaffirmed that a border search lawfully conducted by federal officers under the Fourth Amendment could not be challenged under Article 11 in Vermont criminal court proceedings. Rennis, 2014 VT 8, ¶ 16.

¶ 51. In this case, defendants raise essentially the same argument this Court rejected in Dreibelbis, Coburn, and Rennis—that the evidence discovered during the federal border agents' independent and lawful search must be excluded in their Vermont criminal court proceedings, because if the search had been conducted by Vermont law enforcement officers, Vermont law construing Article 11 of the Vermont Constitution would have presumably required them to obtain a warrant before conducting the search. Furthermore, defendants' contention that excluding such evidence in state court would not interfere with federal interests in safeguarding the border could also be said for each of our controlling precedents, but it did not dissuade this Court from holding in those cases that the evidence seized by federal Border Patrol agents was admissible in Vermont criminal court proceedings.

¶ 52. I find unavailing the efforts of defendants and the majority to distinguish these precedents on grounds that the stop and search in this case was conducted by federal Border Patrol

agents during a roving patrol rather than by federal agents at the border or a permanent checkpoint.[9] The legal principle established in these precedents is that when searches are lawfully conducted under federal law by federal border agents exercising their exclusive authority to safeguard the U.S. border, evidence derived from those searches and turned over to Vermont law enforcement officials is admissible in Vermont criminal proceedings and cannot be challenged under Article 11 unless Vermont law enforcement was involved in the search. To be sure, federal law requires reasonable suspicion for stops and probable cause for searches by roving border patrols—as opposed to searches conducted at the border or its functional equivalent, which are per se reasonable under federal law. But it is the lawfulness of the federal border agents' conduct under federal law that determines the admissibility of any discovered evidence in Vermont criminal court proceedings, pursuant to our precedents. In this case, the stop and search by the roving federal border patrol was lawful; therefore, our precedents squarely govern this case.

¶ 53. The U.S. Supreme Court cases upon which the majority relies neither undercut the reasoning in these controlling precedents nor support the majority's reversal in this case. Those cases hold only that stops and searches by roving borders patrols, as opposed to at the border itself or its functional equivalent, require reasonable suspicion and probable cause or consent, respectively. See Brignoni-Ponce, 422 U.S. at 884 (holding that border agents on roving patrol, as

---

[9] Roving patrols are one of three statutorily authorized "kinds of inland traffic-checking operations"—in addition to temporary and permanent checkpoints—aimed principally at preventing illegal immigration. United States v. Martinez-Fuerte, 428 U.S. 543, 552-53 (1976). Border patrol agents, however, "are not general guardians of the public peace, as are state or local police. Their powers to search places and to search and arrest persons are limited by statute." United States v. Diamond, 471 F.2d 771, 773 (9th Cir. 1973). They are not authorized under federal law to enforce state law. See, e.g., United States v. Brignoni-Ponce, 422 U.S. 873, 883 n.8 (1975) ("Border Patrol agents have no part in enforcing laws that regulate highway use, and their activities have nothing to do with an inquiry whether motorists and their vehicles are entitled, by virtue of compliance with laws governing highway usage, to be upon the public highways."); United States v. Valdes-Vega, 685 F.3d 1138, 1145 n.6 (9th Cir. 2012) ("Because the Border Patrol Agents who stopped [defendant] did not have authority to enforce California traffic laws, [defendant's] violation of California traffic laws cannot form the sole basis for the vehicle stop.").

opposed to at border or its functional equivalent, require reasonable suspicion to stop vehicles); Almeida-Sanchez v. United States, 413 U.S. 266, 273 (1973) (holding that search of petitioner's vehicle by border agents on roving patrol on California road lying at all points more than twenty miles from Mexican border required probable cause or consent). As I stated above, the salient point is that the federal border agents' stop and search of defendants' vehicle in this case was presumably lawful, and therefore evidence derived from the search was admissible in state criminal proceedings without a determination of whether the search would have required a warrant under our interpretation of Article 11 if it had been conducted instead by Vermont law enforcement officers.

¶ 54. I find unpersuasive the majority's attempt to distinguish roving Border Patrol stops and searches by describing them as random and subject to greater enforcement discretion and thus abuse. Lawful stops and searches by roving border patrols, as presumably was the case here, are not random. As noted, stops and searches by roving border patrols must be conducted based on reasonable suspicion and probable cause, respectively. Nor do I see anything in the record suggesting that border agents on roving patrols have more discretion to search vehicles than border agents at the border or at fixed checkpoints.

¶ 55. Notably, the Supreme Court in Brignoni-Ponce cited several factors to be considered in determining whether a roving border patrol stop was based on reasonable suspicion, the first of which is proximity to the border. 422 U.S. at 884-85. Given that roving border patrols require reasonable suspicion and probable cause to stop and search a vehicle for suspected border-related offenses, I find far-fetched defendants' hyperbolic warning of roving border patrols stopping and searching vehicles over much of the state of Vermont. See Almeida-Sanchez, 413 U.S. at 273 (concluding that search of petitioner's vehicle by roving border patrol on California road lying at all points at least twenty miles from Mexican border violated Fourth Amendment in absence of probable cause or consent).

26

¶ 56.    I also disagree with the majority that admitting the evidence in this case in Vermont criminal court proceedings would be inconsistent with the purposes of Vermont's exclusionary rule. As an initial matter, although deterrence may not be the exclusive or even primary purpose of Vermont's exclusionary rule, this Court, like most other courts, have cited the same underlying purposes for the exclusionary rule: deterrence of official misconduct, preservation of the integrity of the judicial process, and protection of the individual rights that were violated in collecting the evidence.   See State v. Badger, 141 Vt. 430, 452-53, 450 A.2d 336, 349 (1982) (stating that introduction of evidence obtained in violation of Vermont Constitution "cannot be admitted at trial as a matter of state law" because it "eviscerates our most sacred rights, impinges on individual privacy, perverts our judicial process, distorts any notion of fairness, and encourages official misconduct"); LaFave, supra, § 1.5(c), at 243 ("The purposes for using the exclusionary rule for violations of state law . . . are essentially the same as those . . . given for suppression where the Fourth Amendment is violated: deterrence of the police; the imperative of judicial integrity; and assuring the people that the government will not profit from lawless behavior.").

¶ 57.    None of these underlying purposes are threatened when federal Border Patrol agents provide Vermont law enforcement with evidence independently and lawfully seized under federal law pursuant to the agents' exercise of their exclusive authority to safeguard the U.S. border.   State v. Gwinner, 796 P.2d 728, 732 n.5 (Wash. Ct. App. 1990) ("[W]hatever the theoretical basis for invoking the [exclusionary] rule, its applicability depends upon state conduct.").

¶ 58.    The exclusionary rule's deterrent effect "rests on its tendency to promote institutional compliance with [constitutional] requirements on the part of law enforcement agencies generally" rather than "on 'penalizing' an individual officer into future conformity with the Constitution."   State v. Oakes, 157 Vt. 171, 180, 598 A.2d 119, 125 (1991) (quotation omitted). Institutional compliance with search-and-seizure law by Vermont law enforcement agencies will not be compromised by admitting in Vermont criminal proceedings evidence lawfully obtained by

federal Border Patrol agents independently of any state conduct, as was the case here.[10]  See State v. Allard, 313 A.2d 439, 451 (Me. 1973) (stating that Customs officials turning over lawfully obtained evidence to state law enforcement "does not promote improper conduct by either local police or Customs agents"); Commonwealth v. Brown, 925 N.E.2d 845, 851 (Mass. 2010) (concluding that where federal agents turned over to state law enforcement lawfully obtained evidence, there was "no unlawful conduct to deter"); State v. Mollica, 554 A.2d 1315, 1328 (N.J. 1989) (concluding that when law enforcement officers of another jurisdiction turn over lawfully and independently obtained evidence to state officials, "no purpose of deterrence relating to the conduct of state officials is frustrated, because it is only the conduct of another jurisdiction's officials that is involved"); Gwinner, 796 P.2d at 732 (suppressing lawfully obtained evidence from another jurisdiction "would not deter our state officers from unlawful conduct, since we are not examining the conduct of state officers").  As the majority itself acknowledges, there is absolutely no evidence to support its conjecture that admitting the evidence obtained in lawful and independent searches by federal Border Patrol agents on roving patrols "might implicitly encourage federal officers to engage in searches that Vermont officers cannot, so that Vermont officers will reciprocate by passing along information regarding immigration violations."  Ante, ¶ 40.

¶ 59.   Nor is the integrity of our judicial process imperiled by admitting in Vermont criminal court proceedings evidence lawfully and independently obtained by federal border agents exercising their authority to safeguard the U.S. border, insofar as "there has been no misuse or perversion of judicial process."  Mollica, 554 A.2d at 1328; see also Brown, 925 N.E.2d at 851 ("Judicial integrity, in turn, is hardly threatened when evidence properly obtained under Federal

---

[10]   Because we are assuming for the purposes of this appeal that the Border Patrol agents complied with federal law, we need not decide whether we would suppress evidence unlawfully seized by Border Patrol agents on roving patrol under either the Fourth Amendment or Article 11. See Coburn, 165 Vt. at 325, 638 A.2d at 1347 (holding that the "Vermont Constitution does not apply to the otherwise lawful conduct" of federal officials "acting under the exclusive authority to safeguard the borders of the United States" (emphasis added)).

law, in a federally run investigation, is admitted as evidence in State courts."); State v. Ramirez, 895 N.W.2d 884, 897-98 (Iowa 2017) (quoting Brown); LaFave, supra, § 1.5(c), at 248 n.169 (labeling as "bizarre reasoning" statement in State v. Torres, 262 P.3d 1006, 1019 (Haw. 2011), that admitting in state courts evidence lawfully obtained in another jurisdiction in manner that would have been constitutionally deficient in receiving state would necessarily be placing those courts' " 'imprimatur of approval' " on such evidence, thereby comprising integrity of judicial process). To the contrary, the public's trust in the integrity of the judicial process is likely to be compromised if we automatically exclude from Vermont criminal court evidence lawfully and independently obtained by Border Patrol agents—including any evidence potentially connected to the commission of serious crimes that threaten the safety of the public or particular individuals. See Brown, 925 N.E.2d at 851 (rigidly applying exclusionary rule when its purposes are not furthered would "frustrate the public interest in the admission of evidence of criminal activity" to greater extent than "any incremental protection it might afford"); accord Ramirez, 895 N.W.2d at 897-98; see Mollica, 554 A.2d at 1327-28 (excluding lawfully obtained evidence from another jurisdiction would offend principles of federalism and comity "without properly advancing legitimate state interests").

¶ 60. As for safeguarding the individual privacy rights protected by Article 11, I reiterate that in this appeal we presume that the federal Border Patrol agents obtained the subject evidence after stopping and searching defendants' vehicle based on reasonable suspicion and probable cause. Thus, in this case, the only state interest furthered is the presumption that if the search had been conducted by Vermont law enforcement officers, they would have had to obtain a warrant first. But excluding the subject evidence in this case would not further the individual privacy interests outlined in State v. Saava, 159 Vt. 75, 616 A.2d 774 (1991), that militate in favor of requiring a search warrant for police to conduct an automobile search based on probable cause.

¶ 61. While acknowledging that criminal defendants may seek judicial review of police searches or seizures, we concluded in <u>Saava</u> that "these after-the-fact challenges do not serve Article 11's purpose of protecting the rights of everyone—law-abiding as well as criminal—by involving judicial oversight before would-be invasions of privacy." <u>Id</u>. at 86, 616 A.2d at 780. We stated that requiring a warrant would spare people the intrusion of "ill-considered searches or at least" give them "an impartial objective assessment before a search is carried out." <u>Id</u>. It would also "bring[] a significant check on law enforcement conduct, because not just fruitful searches will be on the record, and searches on doubtful grounds may not be attempted at all if authorities know they must first go before a judicial officer." <u>Id</u>. at 87, 616 A.2d at 780. Without a warrant, we reasoned, "police behavior would be subjected to judicial scrutiny only in rare cases, while [d]ay by day mischief may be done and precedents built up in practice long before the judiciary has an opportunity to intervene." <u>Id</u>. (internal quotation marks omitted).

¶ 62. Given the unique posture of federal border area automobile searches conducted by federal agents in roving patrols, none of these concerns will be mollified by applying Article 11 requirements to these searches so as to exclude in Vermont criminal court evidence lawfully obtained by federal agents exercising their exclusive authority to safeguard our international border. No Vermont traveler will avoid being subjected to an automobile stop or search by a roving federal border patrol as the result of applying Article 11 requirements to these situations. The federal agents will not seek warrants before lawfully stopping and searching cars based on reasonable suspicion and probable cause that the suspects are engaged in a federal border crime. Thus, criminals and law-abiding persons will be in the exact same position—neither will be spared an ill-considered search or receive an impartial objective assessment by a judicial officer before a search is carried out. In short, individual privacy interests will be unaffected by excluding the evidence; no individual will experience greater privacy by excluding the evidence. Moreover, neither the

30

searched individual's dignity nor the integrity of the judicial process will be negatively impacted by admitting the lawfully obtained evidence in Vermont criminal proceedings.

¶ 63. Our holding today need not go beyond the facts of this case, which concern lawfully and independently obtained evidence by federal Border Patrol agents on roving patrol exercising exclusive federal authority to safeguard the U.S border by stopping and searching vehicles based on reasonable suspicion and probable cause that a federal crime concerning our international border has been committed. Many jurisdictions "have concluded that evidence lawfully obtained by federal officials, under a federal investigation meeting federal standards, may be used in subsequent state prosecutions even though state law would not have permitted the same type of search." Ramirez, 895 N.W.2d at 895 (citing cases); see also LaFave, supra, § 1.5(c), at 248 (stating that "this approach makes good sense"). But see People v. Griminger, 524 N.E.2d 409, 412 (N.Y. 1988) (briefly stating that even though search warrant was issued by federal magistrate and executed by federal agents, defendant should be afforded benefit of state's search-and-seizure law because he was being tried for crimes defined by state's penal laws); State v. Rodriquez, 854 P.2d 399, 403 (Or. 1993) (concluding that although federal agents acted under authority of federal law in conducting warrantless search of defendant's apartment, state constitutional protections apply to evidence prosecutor seeks to use in state prosecution). But in this appeal, we need not consider this broader category of non-border cases. As to evidence independently and lawfully obtained by federal agents on roving border patrol based on reasonable suspicion and probable cause, I would follow our plainly governing precedents.[11] Any different scenarios can be addressed later if and when they are presented to this Court.

---

[11] Because the majority attempts to distinguish Coburn and Rennis, it does not address the arguments of amici curiae to overrule or limit those cases. Thus, for reasons I need not detail in the context of this dissent, I would conclude that the holdings in Coburn and Rennis rested on this Court's sound understanding of principles of federalism, the limits of the Vermont Constitution, and the purposes of the exclusionary rule.

¶ 64.    Accordingly, for the reasons stated above, I respectfully dissent from the majority's reversal of the criminal division's order denying defendants' motion to suppress.

¶ 65.    I am authorized to state that Justice Eaton joins this dissent.

_____
Associate Justice